Prost, Chief Judge, dissenting.
Because I believe that the district court clearly erred when it found there would not have been a reasonable expectation of success in selecting unsubstituted benzyl for R and unsubstituted methyl for R1, I disagree with the majority that the asserted claims of the '551 patent are patentably distinct from the reference patent claims. I therefore respectfully dissent.
I
The parties focused their double-patenting presentations to the district court on whether claim 9 of the '551 patent (asserted claim) is invalid for obviousness-type double patenting over claims 44 and 45 of the '301 patent (reference claims). UCB, Inc. v. Accord Healthcare, Inc. , 201 F.Supp.3d 491, 528 (D. Del. 2016) (" District Court Opinion "). Reference claim 45 covers a genus of compounds known as functionalized amino acids ("FAA") having the following general structure of the formula:
*1331 Id. at 512.
In this formula, R, R1, and R3 are variables, meaning that different elements or compounds can be placed at each of these three sites. When claim 45 is limited to depending from claim 44, the R3 group is defined as methoxymethyl. Id. The definition of R includes unsubstituted benzyl and the definition of R1 includes unsubstituted methyl. Id. at 516.
Lacosamide is one species of this genus. Id. at 512. Lacosamide has a methoxymethyl group at R3, id. at 503, unsubstituted benzyl at R, and unsubstituted methyl at R1, id. at 530. Asserted claim 9 claims lacosamide. Id. at 502. It "fills in the variables of the claim 44/45 equation, so as to narrow the genus of claims 44 and 45 to the species of a single compound, lacosamide." Id. at 515. In other words, claim 9 "selects substituents for R (benzyl) and R1(methyl) that fall within the scope of claims 44/45." Id. at 516. These differences are depicted below:
Id.
II
With respect to the district court's double-patenting analysis, much like the majority, I would leave undisturbed nearly all of the district court's findings. To the extent, however, the district court found that a person of ordinary skill in the art would not have had a reasonable expectation of success in selecting an unsubstituted benzyl for R and an unsubstituted methyl for R1, it clearly erred.
The obviousness-type double-patenting analysis involves determining whether the differences between the claims in the reference patent and the claims in the asserted patent render the claims patentably distinct. AbbVie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr. , 764 F.3d 1366, 1374 (Fed. Cir. 2014). This part of the obviousness-type double-patenting analysis is analogous to an obviousness analysis under 35 U.S.C. § 103. Amgen Inc. v. F. Hoffman-La Roche Ltd. , 580 F.3d 1340, 1361 (Fed. Cir. 2009). An obviousness determination requires that a *1332 skilled artisan would have perceived a reasonable expectation of success in making the invention in light of the prior art. Id. at 1362. This is a question of fact, which we review for clear error following a bench trial. Par Pharm., Inc. v. TWI Pharm., Inc. , 773 F.3d 1186, 1198 (Fed. Cir. 2014). "A factual finding is clearly erroneous if, despite some supporting evidence, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " Pfizer, Inc. v. Apotex, Inc. , 480 F.3d 1348, 1359 (Fed. Cir. 2007) (quoting United States v. U.S. Gypsum Co. , 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948) ).
A
The district court found that a person of ordinary skill in the art would not have had a reasonable expectation of success in selecting an unsubstituted benzyl for R and an unsubstituted methyl for R1. It based this finding largely on a lack of data showing the effect of placing these substituents at their respective positions. District Court Opinion , 201 F.Supp.3d at 532. The court stated that "given how unpredictable drug development is, and the high likelihood that any formulation will prove unsuccessful, the lack of data strongly contributes to the [c]ourt's finding." Id. (citations omitted).
Although we cannot reject the district court's finding that drug development is unpredictable, "obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." Pfizer , 480 F.3d at 1364. In reality, "there were many tests conducted on FAAs with benzyl at R and methyl at R1." District Court Opinion , 201 F.Supp.3d at 531. And indeed, as the district court found, 75% of Dr. Kohn's experimental compounds contained benzyl at R and methyl at R1, and most of these were unsubstituted. Id. As I detail below, the district court's findings of fact as to the prior art provided ample evidence showing that a person of skill in the art would have had a reasonable expectation of success in creating an FAA with anticonvulsant activity by selecting an unsubstituted benzyl for R and an unsubstituted methyl for R1. While it is true that there may be some evidence supporting the district court's view, given the overwhelming evidence to the contrary, I am "left with the definite and firm conviction that a mistake has been committed." Pfizer , 480 F.3d at 1359 (quoting U.S. Gypsum , 333 U.S. at 395, 68 S.Ct. 525 ).
In 1985, Dr. Kohn published the anticonvulsant activity of his first FAA compound, AAB. District Court Opinion , 201 F.Supp.3d at 505. AAB contained a benzyl at R, and a methyl at R1. Id. According to Dr. Kohn, AAB demonstrated the "proof of concept" for FAAs. Id. Two years later, Dr. Kohn reported on the anticonvulsant activity of sixteen structural analogues of AAB. Id. The paper used unsubstituted benzyl at R and unsubstituted methyl at R1 as a "reference point," and considered five possible modifications of the unsubstituted benzyl at R and three modifications of the unsubstituted methyl at R1. Id. at 506.
In Dr. Kohn's 1990 paper, he also kept "R1 constant and R constant" as methyl and benzyl, respectively. Id. at 509. He reported that the most potent compound was 2g, which had benzyl at R and methyl at R1. Id. Unlike lacosamide, 2g had an aromatic 2-furanyl structure at R3. Id. Compound 2g "was found to be significantly more potent than APB [described in a 1988 paper], and at the time in 1990 when this paper was published this was the most potent compound in the FAA family." Id.
Dr. Kohn then summarized his prior FAA work in a 1991 paper. Id. All twenty-six compounds reported in that paper had unsubstituted benzyl at R and unsubstituted *1333 methyl at R1 with different compounds at the R3 group. Id. at 506-07. Dr. Kohn explained in this paper that "you get potent protection if you have a benzyl on one end [at R] and a methyl on the other [at R1]." Id. at 506. The 1991 paper also identified compound 3l, which possessed "the best activity to date" for any FAA racemate. Id. at 507. Compound 3l had unsubstituted benzyl at R and unsubstituted methyl at R1 with methoxyamino at R3. Id.
Dr. Kohn continued to explore and publish data for many other compounds with different groups at R3. Id. at 506. In a 1993 paper, Dr. Kohn published the results of an experiment investigating modifications of the 2-furanyl group at R3 with other heteroaromatic groups. Once again, the "starting point" was benzyl at R and methyl at R1. Id.
On this record it is clear that Dr. Kohn's extensive study of FAAs provides copious amounts of information from which a person of ordinary skill would form a reasonable expectation that the selection of an unsubstituted benzyl for R and an unsubstituted methyl for R1 would lead to the successful creation of an FAA with anticonvulsant activity. Indeed, Dr. Kohn described unsubstituted benzyl for R and an unsubstituted methyl for R1 as the "starting point" or "reference point" for nearly every experiment he published. Dr. Kohn himself explained in his 1991 paper (where all 26 compounds reported had unsubstituted benzyl at R and unsubstituted methyl at R1) that "you get potent protection if you have a benzyl on one end [at R] and a methyl on the other [at R1]."[1] Id. at 506.
The district court recognized that "there were many tests conducted on FAAs with benzyl at R and methyl at R1." Id. at 531. But it dismissed the resulting data because "[m]ost of these tests kept the structures at R and R1 constant in order to assess changes made at the R3 position" and so "any changes (whether increases or decreases) observed in anticonvulsant behavior and/or neurotoxicity would be attributed to the structure at R3 rather than to the benzyl at R or the methyl at R1." Id. In dismissing the data resulting from these tests, the court clearly erred. Although the experiments may have been designed to assess changes made at the R3 position, by using unsubstituted benzyl for R and an unsubstituted methyl for R1 as the "starting point" or "reference point" for these tests, the prior art showed, without question, that those substituents would work at those positions. And not only did the prior art show that unsubstituted benzyl works at R and that unsubstituted methyl works at R1, the prior art showed that FAAs with these substituents so positioned demonstrate anticonvulsant activity.
It was clear error for the district court to require testing to provide "insight into the effectiveness of benzyl and methyl relative to other structures that could be placed at R and R1." Id. Where the prior art teaches that the selected substituent will work, even when it is selected from thousands of compounds, an inability to predict how any one substituent will work in the composition and a need for testing will not render that selection nonobvious. See In re Corkill , 771 F.2d 1496, 1500 (Fed. Cir. 1985) ("Although [the inventor] declared that it cannot be predicted how any candidate will work in a detergent composition, but that it must be tested, this does not overcome [the prior art's]
*1334 teaching that hydrated zeolites will work."); Pfizer , 480 F.3d at 1364.
Further, if, as the district court found, all the testing focused on R3 and a person of ordinary skill would attribute anticonvulsant behavior to R3, once R3 was fixed in the '301 reference patent genus, plugging in unsubstituted benzyl at R and unsubstituted methyl at R1(which had remained largely constant throughout the prior art testing) would be viewed simply as a trivial selection. Indeed, because the '301 claim is a genus claim, with only two variables R and R1, a person of ordinary skill would know to select a substituent for each variable. A person of ordinary skill would certainly have a reasonable expectation of success when deciding which substituents to select if she copied the "75% of Dr. Kohn's compounds [which] contained benzyl at R and methyl at R1, and most of these were unsubstituted." District Court Opinion , 201 F.Supp.3d at 531.
In dismissing the data resulting from the many tests conducted with unsubstituted benzyl at R and unsubstituted methyl at R1 and in relying so heavily on what it saw as a lack of data, the district court clearly erred.
B
The district court also erred when it found that the limited data that did exist at the time would not have led a person of ordinary skill to place an unsubstituted benzyl at R or an unsubstituted methyl at R1. Id. at 532. Indeed, the data that were available showed that unsubstituted benzyl at R and an unsubstituted methyl at R1 were comparable to, if not better than, any other substituents tested.
For example, Dr. Kohn, in his 1985 paper, used unsubstituted benzyl at R and unsubstituted methyl at R1 as a "reference point," and considered five possible modifications of the unsubstituted benzyl at R and three modifications of the unsubstituted methyl at R1. Id. at 506. With respect to the R position, only one of the five R modifications showed activity comparable to unsubstituted benzyl at R. Id. The others showed decreased activity. Id. For the R1 position, each of the three modifications decreased anticonvulsant activity when compared to unsubstituted methyl. Id.
Dr. Kohn also considered, in his 1990 paper, the effect of replacing an unsubstituted benzyl at R and found that placing a fluoro-substituted benzyl at R yielded only a comparable anticonvulsant effect. Id. Fluoro-substituted benzyl at R did, however, provide a "far superior" protective index. Id. Yet, this must be balanced against Dr. Kohn's 1991 paper (where all 26 compounds reported had unsubstituted benzyl at R and unsubstituted methyl at R1) explaining that "you get potent protection if you have a benzyl on one end [at R] and a methyl on the other [at R1]." Id. (emphasis added).
Thus, the data that were available showed that unsubstituted benzyl at R and an unsubstituted methyl at R1 were comparable, if not better, than any other substituents that were tested with respect to anticonvulsant activity. Despite the test that demonstrated fluoro-substituted benzyl's "far superior" protective index, these tests provide strong evidence that a person of ordinary skill would have a reasonable expectation of success in selecting these substituents in order to create an FAA having an anticonvulsant effect. This is especially so with respect to selecting unsubstituted methyl for R1 as it was the most successful substituent tested. Although these data might have shown that there was no guarantee that unsubstituted benzyl at R would provide the greatest protective index as compared to other possible substituents, "only a reasonable expectation *1335 of success, not a guarantee, is needed." Pfizer , 480 F.3d at 1364.
Accordingly, the district court clearly erred when it found that the data specific to R and R1 that did exist at the time would not have led a person of ordinary skill to place an unsubstituted benzyl at R or an unsubstituted methyl at R1.
C
Finally, and perhaps most importantly, the district court erred when it did not consider the LeGall Thesis in its primary double-patenting analysis.[2] See District Court Opinion , 201 F.Supp.3d at 530-35. For purposes of this litigation, the parties agree that the LeGall Thesis constitutes a "printed publication" within the meaning of 35 U.S.C. § 102(b).[3] Id. at 508.
Importantly, the LeGall Thesis disclosed compound 107e which, exactly like lacosamide, has a methoxymethyl group at R3, an unsubstituted benzyl at R, and an unsubstituted methyl at R1. Id. Compound 107e is identical to lacosamide except that it contains both the R- and S-enantiomers in a mixture, rather than just the R-enantiomer. Id. Although he did not have data for compound 107e, LeGall hypothesized that structural similarities between compound 107e and another compound for which he did have data, 86b, suggested that compound 107e "may have good anticonvulsant activity." Id. at 509.
The LeGall Thesis is highly relevant to the obviousness analysis. For example, the majority concluded that "the trial evidence supports the district court's finding that there was no prior art that would have provided a person of ordinary skill reason to believe that unsubstituted benzyl and methyl would have been successful with a methoxymethyl group." Majority Op. 1326. Not so. The thesis disclosed a compound having, like lacosamide, a methoxymethyl group at R3 together with an unsubstituted benzyl at R and an unsubstituted methyl at R1 and it provided a reasonable hypothesis, based on structural similarities to other compounds, that this compound "may have good anticonvulsant activity." District Court Opinion , 201 F.Supp.3d at 509. Again, "only a reasonable expectation of success, not a guarantee, is needed." Pfizer , 480 F.3d at 1364. Thus, to the extent the district court found that there was no indication in the prior art that benzyl and methyl would have been successful with a methoxymethyl group, it clearly erred.
Certainly this evidence, especially when considered along with the other evidence before the district court, would have strongly contributed to a person of ordinary skill in the art's having a reasonable expectation of success in creating an FAA with anticonvulsant activity by selecting an unsubstituted benzyl for R and an unsubstituted methyl for R1.
* * *
*1336 Considering all of the evidence, despite some supporting evidence identified by the district court, I am "left with the definite and firm conviction" that the district court made a mistake. Id. at 1359 (quoting U.S. Gypsum , 333 U.S. at 395, 68 S.Ct. 525 ). Thus, I conclude that the district court clearly erred in finding that one skilled in the art would not have had a reasonable expectation of success with unsubstituted benzyl at R and unsubstituted methyl at R1. Taking the district court's clear error together with the remainder of its fact findings, I would have concluded that claims 9, 10, and 13 of the asserted '551 patent are not patentably distinct from the reference claims. Thus, I would reverse the district court's conclusion and hold that the asserted claims of the '551 patent are invalid for obviousness-type double patenting. I therefore respectfully dissent.

Additionally, I find it significant that unsubstituted benzyl and unsubstituted methyl were most often used together at R and R1, respectively. In other words, they are presented throughout the prior art as a pair. Thus, a person of ordinary skill would not need to independently select benzyl for R and then separately select methyl for R1, as the district court posited.

The majority takes issue with my characterization of the district court's opinion on this point. I do not mean to imply that the district court did not make any findings of fact as to the LeGall Thesis. The court certainly did in its introductory "Findings of Fact" section. District Court Opinion , 201 F.Supp.3d at 508-09. But I maintain that the district court determined in its primary double-patenting analysis that there was no reasonable expectation of success without considering the teachings of this reference. A citation to two pages of Dr. Roush's trial testimony, stripped of any reference to the LeGall Thesis, cannot cure this deficiency.

The majority, in support of its conclusion, notes that the USPTO instituted an ex parte reexamination of the '551 patent and concluded that claims 9, 10, and 13 were not unpatentable for obviousness-type double patenting over the '301 patent, Kohn 1991, and the '729 patent. Crucially, however, the USPTO did not institute trial as to grounds relying on the LeGall Thesis.